UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

David Parker,

    Plaintiff,

v.                                                                    Case No. 06-10951

Defendant Charter Township of Redford,        Honorable Sean F. Cox

    Defendant.
_____/

## OPINION & ORDER

This age discrimination and retaliation action is currently before the Court on Defendant's Motion for Summary Judgment. The parties have fully briefed the issues and the Court heard oral argument on May 31, 2006. For the reasons that follow, the Court shall grant the motion in part, and dismiss Plaintiff's federal retaliation claim for failure to exhaust administrative remedies. The Court shall deny the motion with respect to all other grounds for relief.

BACKGROUND

Plaintiff David Parker ("Plaintiff" or "Parker") was employed by Defendant Charter Township of Redford ("Defendant" or "the Township") from 1965 to 2005. On December 2, 1993, Parker gave notice of his intent to retire from his position of Chief of Police as of December 30, 1993. (Ex. 2 to Def.'s Br.). Parker testified that he was then told by the current Township Supervisor, Mr. Kelley, that the Township was considering moving to a single Public Safety Director position in order to save money, and that Kelley asked if Parker would be

1

interested in such a position. (Parker Dep. Tr., attached as Ex. 3 to Def.'s Br., at 12-13).

On December 29, 1993, the Township and Parker executed a "Public Safety Director Employment Agreement" under which the "Township employ[ed] and engage[d] Parker in the position of Public Safety Director as an appointee of the Township Board of Trustees." (Ex. 1 to Pl.'s Br. at 1). Pursuant to that agreement, the Public Safety Director "is responsible for the general supervision of law enforcement, crime and fire prevention, fire suppression, and emergency medical service in the Township." (*Id.*). The Employment Agreement had a term of one-year, expiring December 29, 1994. (*Id.*; PSMF[1] at ¶ 4).

On December 29, 1994, a second employment agreement for the Director of Public Safety position was executed. Although that second agreement had a term of three years, expiring December 29, 1997 (PSMF at ¶ 5), Parker continued to serve as the Director of Public Safety after that date. (PSMF at ¶ 6). It is undisputed that Parker continued in that role until his termination on May 26, 2005. (*Id.*).

In the November 2004 general election, Roger Miles Handy ("Handy") was elected the new Township Supervisor.

Keith Anderson ("Anderson"), who was employed by the Township's Police Department, states that Handy approached him prior to the 2004 election asking for his support. (*See* Anderson Affidavit, attached as Ex. 6 to Pl.'s Br.). Anderson states that Handy asked if he would urge his friends on the police force to support him and mentioned putting Anderson into Parker's position of Director of Public Safety if he was elected. (*Id.*). Anderson states that when

---

[1] In compliance with this Court' practice guidelines, the parties submitted statements of undisputed material facts. The parties respective statements of material facts are referenced herein as "PSMF."

he questioned Handy's ability to do so, given his belief that it was a position appointed by the Township Board, Handy responded that would be no problem because he had "four votes already." (*Id.*).

Handy won the election in November 2004, and became the new Township Supervisor. Anderson states that after the election Handy again expressed that he planned on putting Anderson into the position of Director of Public Safety. (Anderson Affidavit). At least two witnesses have testified that following the election, rumors circulated that Handy may replace Parker with someone else, either Anderson or another person named Wilkinson. (*See* Brang Dep. at 14-16; Sesko Dep. at 61-62).

Parker testified that he heard such rumors and that Handy then told him that he wanted him to retire and that he "wanted to go in a new direction." (Parker Dep. at 48). Parker states that he responded by telling Handy that he "could take him in any direction that he wanted to go," but that Handy said he "wanted to do it with somebody new." (*Id.*).

On November 29, 2004, Handy hired Thomas O'Connor to perform certain human resources consulting work for the Township. (Ex. 10 to Pl.'s Br.). Parker testified that O'Connor spoke with him in connection with that work and that O'Connor "brought up the fact that they wanted me to leave." (Parker Dep. at 49). He further testified:

> And that was discussed, and I said I really didn't want to go. And then later on in the afternoon, he come by my house and dropped off a typed up letter of resignation as a – he said, use that as a model, to turn in my resignation.

(Parker Dep. at 49-50). Parker states that he did not want to retire and never asked for a sample resignation letter. (*Id.*).

Thomas Sesko ("Sesko"), the Township's Personnel Director, testified that he mailed a draft retirement agreement to Parker in January of 2005, as a result of a meeting that Parker had been in with Sesko, Handy and O'Connor. (Sesko Dep. at 16 & 34-35). He further testified that he discussed that agreement with Parker a couple of times, asking Parker "if he had signed the agreement yet or when he was going to sign it." (*Id*.). Sesko testified that Parker indicated he was having his attorney review the agreement, but that Parker never signed the agreement. (*Id*. at 34-36).

Parker testified that he saw his physician, Dr. William Penn, in February 2005, and Dr. Penn told him that his blood pressure was "out of sight" and that he did not want him to return to work. (Parker Dep. at 55). A written note from Dr. Penn, indicating that Parker was totally incapacitated from February 17, 2005 to April 20, 2005, but providing no details as to Parker's condition, was provided on March 28, 2005. (Ex. 25 to Pl.'s Br.). Dr. Penn later provided more information regarding Parker's condition and extended Parker's leave to May 20, 2005. (*See* Ex 36 to Pl.'s Br.; Ex. 19 to Def.'s Br.).

In a letter dated April 27, 2005, the Township's counsel notified Parker's counsel that Parker's medical leave would expire on May 12, 2005. (Ex. 22 to Pl.'s Br.). That letter also expressed that the Township hoped that Parker would be given unrestricted medical clearance to return to work on or before May 12, 2005. The letter further stated that if Parker "is not provided with such clearance from his physician, the Township will take the appropriate action at that time." (*Id*.). Another letter from the Township advised Parker that "[p]rior to your return to work we will need a separate doctor's statement authorizing your return. This statement needs to come from your treating physician(s) and needs to be on the physician(s)'s stationary and must

4

include your limitations if any." (Ex. 16 to Def.'s Br.). Dr. Penn provided such written authorization on May 7, 2005, stating that Parker "[m]ay return to work with no restrictions on 5/12/05." (Ex. 23 to Pl.'s Br.).

Parker testified that he attempted to return to work on May 12, 2005. (Parker Dep. at 75-77). At that time, Parker also submitted a letter to the Township Board. (*Id*.; Letter attached as Ex. 9). In that three-page letter, addressed to Handy and the entire Township Board, Parker expressed his concern that he was the "recipient of unlawful age discrimination" and provided details as to his "concerns regarding Mr. Handy's deliberate violation of departmental policies, township ordinances, state and federal laws with regard to [his] treatment." (*Id.)*.

After reporting for work on May 12, 2005, Parker was instructed to go home. (Sesko Dep. at 55). Sesko testified that while the Township "had a return to work authorization, it wasn't clear to us whether or not he was actually well enough to return to work or if there were some restrictions as to why there was such a change in his medical condition that allowed him to return to work." (*Id*.). At the request of the Township, Parker was sent for an independent physical examination. (*Id*. at 56). Dr. Thomas J. Petz examined Parker at the request of the Township and provided a written report dated May 16, 2005, concluding that Parker "suffers no disability" and is "physically qualified to perform duties of employment as he had previously performed." (Ex. 24 to Pl.'s Br.). Nevertheless, Parker was not allowed to return to work. (Sesko Dep. at 58).

At a Special Meeting held on May 26, 2005, the Township's Board voted to "not renew the contract with Dave Parker, as Public Safety Director" and to "amend the 2005/2006 Budget by eliminating the Public Safety Director position." (Exhibit 2 to Pl.'s Br.). The following

Board Members were present at that meeting: Township Supervisor Handy, Garth J. Christie, Kelly Fleming, Tracey Kobylarz, and Kim Sivyer. (*Id.*). Two Board Members, Robert F. Brang, Jr. and Pat Mcrae, were absent from the meeting. (*Id.*).

Anderson states that "[i]n June 2006, there was a discussion at a Township Board meeting to create a civilian, Director of Police Operations position" and that shortly after that the Township posted the job of Chief of Police. (Anderson Affidavit). He further states:

> 24. When I approached Mr. Handy after the board meeting regarding the Board's actions that seemed to end any hope of my filling the position of Director of Public Safety, he told me that things were more complicated now and that he was concerned about a lawsuit from David Parker.
> . . . .
> 26. I was never appointed to the position of Director of Public Safety.
> . . . .
> 28. I was lied to by Mr. Handy when he promised me the Director of Public Safety position and was lied to each time I discussed this promise with Mr. Handy after he was elected.

(*Id.*).

On June 30, 2005, Parker filed a Charge of Discrimination with the Michigan Department of Civil Rights and the EEOC. (Ex. 26 to Pl.'s Br.). Parker's Charge of Discrimination indicated that the discrimination took place on May 26, 2005. The form asked the complainant to identify the type of discrimination alleged by having the complainant check the appropriate boxes for the following: race, color, sex, religion, national origin, retaliation, age, disability, and other. The only box checked by Parker was age. In sum, Parker alleged that he was "harassed, discharged and forced to work in a hostile environment on the basis of my age (63), in violation of the Age Discrimination in Employment Act of 1967, as amended." (*Id.*).

On January 18, 2006, the EEOC closed its file on the charge because, based upon its investigation, the EEOC was unable to conclude that the information obtained established a violation of the statute. (*See* Dismissal and Notice of Rights Letter, attached as Ex. 27 to Pl.'s Br.).

Parker then filed this action against the Township on March 2, 2006, asserting the following claims: "Age Discrimination Under ADEA" (Count I); "Age Discrimination Under ELCRA" (Count II); "Retaliation Under ADEA" (Count III); and "Retaliation Under ELCRA" (Count IV).

At his deposition in this matter, Ronald Caryl ("Caryl"), the Township's former Superintendent of Water and Sewers, testified that on one occasion, while Parker was off on sick leave, he had a conversation with Handy about Parker during a break from some type of Township meeting. (Caryl Dep. at 6-7). Caryl described the conversation as follows:

> Some of the discussion at the meeting as I recall had been about the position of director of public safety. And when he came out – and I don't even know who initiated the conversation – it had to do with how Mr. Parker could be replaced. And my statement was if he's a contract employee with an expired contract, okay, then you are operating under an oral extension of a written contract and there is a legal way to end it. You should talk to your attorney. **And his response was Dave is old, he's been here to [sic] long, it's time for him to go, he needs to get out and make room for a younger man.**

(Caryl Dep. at 7-8)(emphasis added).

ANALYSIS

I.  Plaintiff's Age Discrimination Claims:

Counts I and II of Parker's complaint allege age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq*. ("ADEA") and age discrimination

7

under Michigan's Elliot-Larsen Civil Rights Act ("the ELCRA"). At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on his discrimination claim. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

Direct evidence is evidence that is free of inferences and that, if believed, requires a finding that "unlawful discrimination was at least a motivating factor in the employer's actions. *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). "It does not require the fact finder to draw any inferences to reach that conclusion. *Id*. Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed. *Id.*

Under the circumstantial evidence approach, a plaintiff must show the existence of facts which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Both parties acknowledge that the *McDonnell Douglas* framework is applied to age discrimination claims brought under the ADEA and the ELCRA and that Plaintiff bears the burden of establishing a prima facie case.

Once a plaintiff establishes such a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the Plaintiff's discharge. If the employer articulates such a reason, then the Plaintiff has the burden of showing that the articulated reason is in reality a pretext to mask discrimination. *Skrjanc v. Great Lkakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001).

Here, Parker contends that direct evidence of age discrimination exists. He submits that Handy's comment to Caryl, that "Dave is old, he's been here to[o] long, it's time for him to go, he needs to get out and make room for a younger man" constitutes direct evidence that he was

terminated because of his age.

Parker also claims that a comment that Handy allegedly made at another meeting reflected his "general age animus." The only evidence regarding that comment is the following testimony from John Buck:

> Q. Chief Buck, were you ever at a department head meeting or staff meeting where Ron Caryl was present, Mr. Handy was present, and you were present any maybe other people were present, where there was any discussion by Mr. Handy regarding whether or not people should retire?
>
> A. I recall something. I took it as kind of a humorous kind of thing. I don't know if it was directed to anybody in particular.
>
> Q. What do you recall Mr. Handy saying?
>
> A. Just something about people should retire or they can retire, something to that effect. But there were several senior folks in the room, so I didn't really give it any thought.
>
> Q. What did you find humorous about what he said?
>
> A. Just that the way it was presented. It was kind of a light hearted kind of comment.

(Buck Tr. at 32).

Parker contends that the above evidence is sufficient direct evidence of discriminatory animus and that he need not show anything more to survive summary judgment.

In its opening Brief, the Township asserts that no direct evidence of discrimination exists and then proceeds to discuss the circumstantial approach. Thus, no argument regarding direct evidence is found in the Township's opening brief. In its Reply Brief, the Township asserts that the sole comment allegedly made by Handy to Caryl is not sufficient because: 1) Handy denies[2]

---

[2] Handy's denial is obviously irrelevant for purposes of a summary judgment motion where the evidence must be viewed in the light most favorable to Plaintiff, the non-moving party.

9

making it; 2) the comment can only be characterized as stray, isolated and ambiguous because Caryl could not identify the date of the comment; and 3) Caryl never reported the comment to others at that time.  The Township also contends that there is no evidence that other Board members who voted to eliminate Parker's position were aware of Handy's comment.

The Court concludes that this is one of the relatively rare instances where direct evidence exists to support a claim of age discrimination.

In age discrimination cases, generally courts examine statements allegedly showing employer bias by considering whether the comments were made by a decision maker; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination.  *Krohn v. Sedgwick James, Inc.,* 244 Mich.App. 289, 298 (2001).

As stated *supra*, direct evidence is evidence that is free of inferences and that, if believed, requires a finding that "unlawful discrimination was at least a motivating factor in the employer's actions.  *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).  Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed.  *Id.*  For example, a facially discriminatory employment policy or a corporate decision maker's express statement to remove employees in the protected groups is direct evidence.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Such evidence was found to exist in *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000), where the university president allegedly said that "[w]e already have two black vice presidents.  I can't bring in a black provost."  Those comments were found to constitute direct evidence of discrimination because they required no inference to conclude that racial

consideration motivated, at least in part, the employment decision at issue.

Direct evidence of discrimination was also found to exist in *Diaz v. City of Inkster*, 2006 WL 2192929 (E.D. Mich. 2006), where the plaintiff alleged that he was discriminated against on the basis of race. In that case, the plaintiff offered testimony that the City Manager had said that there were some "members on the council that wanted a black chief" and "when [the current police chief] retires, you can bet the next chief is going to be black." *Id.* at *9. The court concluded that the comments of that decision-maker constituted direct evidence because they expressed that race was a determining factor in the employment decision.

Here, it is undisputed that Handy was a decision-maker with respect to Parker's termination. Parker has also submitted evidence to establish that Handy stated he had the support of four members of the Board with respect to removing Parker. (Anderson Affidavit). Caryl, the Township's former Superintendent of Water and Sewers, testified that he had a conversation with Handy about Parker – during a break from a Township meeting in which Parker's position had been discussed -- and that Handy said that Parker "**is old, he's been here to[o] long, it's time for him to go, he needs to get out and make room for a younger man.**" (Caryl Dep. at 7-8)(emphasis added). The Court concludes that the comments were related to the decision-making process, in that they were made during a break from a Township meeting during which the position of Director of Public Safety had been discussed.

Moreover, while Caryl could not provide the exact date on which the comments were made by Handy, Caryl did testify that Handy made the comment while Parker was out on sick leave. It is undisputed that Parker's sick leave was from February 17, 2005 to May 12, 2005. Thus, if believed by the jury, Caryl's testimony would establish that the comment was made

11

during the two and a half month period just prior to Parker's termination. Thus, the comment was proximate in time to Parker's termination.

The Court also rejects the Township's assertion that the comments are vague or ambiguous. The Court finds that, like the evidence in *Johnson* and *Diaz,* Handy's alleged comments constitute direct evidence of age discrimination because they require no inference to conclude that age motivated, at least in part, Parker's termination.

Accordingly, the Court concludes that Parker has presented sufficient direct evidence of age discrimination to survive summary judgment and he therefore does not need not establish a prima facie case of discrimination via circumstantial evidence. As such, the Court's inquiry ends and the Township's request as to Counts I and II must be denied.

II.     Plaintiff's Retaliation Claims:

Parker alleges claims of retaliation in violation of the ADEA, 29 U.S.C §623(d) and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA").

The parties agree that to establish a prima facie case of retaliation, a plaintiff must show that: 1) he engaged in protected activity; 2) the defendant knew of the exercise of that protected activity, 3) defendant took an adverse employment action following the protected activity; and 4) there was a causal connection between the protected activity and the adverse action.

The Township challenges Parker's retaliation claims on two grounds: 1) it contends that Parker's federal retaliation claim is barred because Parker never filed a retaliation claim with the EEOC and he therefore did not exhaust his administrative remedies before filing suit; and 2) Parker cannot establish a prima facie claim of retaliation.

A.  Failure To Exhaust:

In its Reply Brief,[3] the Township asserts that Parker's federal retaliation claim must be dismissed because Parker failed to indicate any claim of retaliation on his EEOC complaint and therefore any federal retaliation claim was outside of the scope of the EEOC charge and he cannot proceed with such claim before this Court. The Township does not contend, however, that Parker's retaliation claim under the ELCRA must be dismissed on the same basis. The Township relies on *Ang v. Proctor & Gamble*, 932 F.2d 540, 546-47 (6th Cir. 1991).

Although the failure to exhaust argument was not raised until the Township's Reply Brief, the argument is supported by Sixth Circuit authority.

The ADEA prohibits discrimination in the compensation, terms, conditions or privileges of employment based on age and prohibits discrimination against any employee who has opposed an unlawful practice under the Act. Michigan's ELCRA prohibits age discrimination in a similar manner. *Sherman v. Chrysler Corp.*, 47 Fed. Appx. 716, 720 (6th Cir. 2002). "Federal law requires that a person aggrieved by a discriminatory act first exhaust his administrative remedies with the EEOC by filing a charge of discrimination." *Id.* (citing 29 U.S.C. §626(d)(2)); *see also Hoover v. Timken Co.*, 30 Fed. Appx. 511 (6th Cir. 2002)(stating that "[t]o exhaust administrative remedies under the ADA or ADEA, a plaintiff must file an EEOC charge within 180 days of the alleged discrimination (or with the state agency within 300 days)" and the "[f]ailure to timely exhaust administrative remedies is an appropriate basis for dismissal of an ADA or ADEA action."). Michigan law, however, has no such exhaustion requirement with

---

[3]Because this ground for relief was not presented in the Township's opening brief, Parker did not address it in his Response Brief.

13

respect to claims asserted under the ELCRA. *Id*.

Here, Parker's EEOC charge only referenced age discrimination, in both the narrative portion of the charge and the section where the types of discrimination alleged are checked off in boxes. Nowhere in the EEOC charge does Parker even mention his May 12, 2005 letter to Township Board, much less allege retaliation for having submitted that letter. Thus, even when liberally construed, the Court concludes that Parker's EEOC charge did not assert a claim that Defendant retaliated against him for having submitted his May 12, 2005 letter. *Ang, supra; Sherman, supra; Jones v. Sumser Retirement Village*, 209 F.3d 851 (6th Cir. 2000).

Accordingly, the Court concludes that Parker's *federal* retaliation claim must be dismissed. Moreover, Plaintiff's counsel conceded at the May 31, 2007 hearing that Parker's federal retaliation should be dismissed for failure to exhaust his remedies. Because no exhaustion requirement exists as to Parker's retaliation claim under Michigan's ELCRA, however, his state law retaliation claim remains in this action.

The Court must therefore examine the Township's second ground for dismissal of Parker's retaliation claim – that he cannot establish the first element (protected activity) and fourth element (causal connection) of a prima facie case.

B.  Prima Facie Case:

The Township first contends that Parker cannot establish the requisite protected activity. It contends that the filing of Parker's EEOC complaint cannot be the protected activity because it occurred after the adverse action (Parker's termination). It also contends that Parker cannot establish retaliation with respect to his FMLA leave because he was afforded all the time off that he sought. The Township does not address Parker's May 12, 2005 letter to the Township Board

(Ex. 9 to Pl.'s Br.) in its opening brief.

The Township further contends that Parker cannot establish the requisite causal connection and that temporal proximity alone is insufficient.

Parker responds by stating that his May 12, 2005 letter to the Township Board is the protected activity. The Acts at issue prohibit retaliation for opposing any unlawful practices. Parker's May 12, 2005 letter to the Township Board expressed his concern that he was the target of unlawful age discrimination.

Parker also contends that he can establish the requisite causal connection for his prima facie case. He contends that the close temporal proximity (approximately two weeks) between his May 12, 2005 letter to the Township Board and the Board's May 26, 2005 termination of his position is sufficient evidence from which an inference could be drawn that the adverse action was due to the protected activity. He further asserts that the Township's actions in not allowing him to return to work on May 12, 2005, despite his having a written authorization from his physician to do so, is further evidence of causation. Moreover, even after the Township's independent physician cleared Parker to return to work, the Township still would not allow Parker to return to work prior to terminating his position on May 26, 2005. (Ex. 24 to Plaintiff's Br.; Sesko Dep. at 58).

The Court concludes that Parker's May 12, 2005 letter, is clearly protected activity. Thus, the first element is met.

The Court further concludes that Parker has also met the fourth element of establishing a causal connection between the protected activity and the adverse action.

"[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some

15

evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence." *Avery Dennison Corp.*, 104 F.3d at 861. "A causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable factfinder to infer that an action had a discriminatory or retaliatory basis." *Rymal v. Baergen*, 262 Mich.App. 274, 303 (2004).

Here, the temporal proximity between the protected activity (Parker's May 12, 2005 letter to the Township Board) and the adverse action (his termination on May 26, 2005) is strong.

In addition to that temporal proximity, Parker has also produced other evidence that, with reasonable inferences, can be construed as deducing a causal connection between Parker's May 12, 2005 letter and his termination two weeks later. On May 12, 2005 -- the same day he gave his letter to the Township Board – Parker attempted to return to work. Parker had provided the Township with a written authorization from his physician to return to work on May 12, 2005, as he had been requested to do. Although Dr. Penn's authorization stated that Parker had "no restrictions," Sesko testified that Parker was sent home on May 12, 2005, because it was not clear whether he had some restrictions. Moreover, Parker was not allowed to return to work even after the independent physician that examined Parker at the request of the Township cleared him for work.

Taken collectively, the Court concludes that the above evidence is sufficient to establish the causal connection necessary for Parker's prima facie case. Accordingly, the Township is not entitled to summary judgment with respect to Parker's retaliation claim brought under Michigan's ELCRA.

## CONCLUSION & ORDER

Accordingly, **IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED IN PART**, in that Plaintiff's federal retaliation claim (Count III) is hereby **DISMISSED** for failure to exhaust administrative remedies. Defendant's Motion for Summary Judgment is **DENIED** in all other respects.

**IT IS SO ORDERED**.

          S/Sean F. Cox
          Sean F. Cox
          United States District Judge

Dated: June 11, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 11, 2007, by electronic and/or ordinary mail.

          S/Jennifer Hernandez
          Case Manager